# In the United States Court of Federal Claims

No. 20-459
Filed Under Seal: July 27, 2020
Reissued: July 30, 2020*

| | |
|---|---|
| **AAR MANUFACTURING, INC. D/B/A AAR MOBILITY SYSTEMS,** | Keywords:  Organizational conflict of interest; Biased-Ground-Rules OCI; Impaired-Objectivity OCI; Unequal-Access-to-Information OCI; Motion for Judgment on the Administrative Record; RCFC 52.1. |
| *Plaintiff,* | |
| v. | |
| **UNITED STATES,** | |
| *Defendant,* | |
| **and** | |
| **TABER EXTRUSIONS, LLC,** | |
| *Defendant-Intervenor.* | |

*Paul R. Hurst*, Steptoe & Johnson LLP, Washington, D.C., for the plaintiff, with whom were *Fred W. Geldon* and *Caitlin T. Conroy*, Steptoe & Johnson LLP, Washington, D.C., of counsel.

*Stephen C. Tosini*, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C. for the defendant, with whom was *Captain Seiji Ohashi*, Department of the Air Force, Department of Defense, Joint Base Andrews, Maryland, of counsel.

*Anthony H. Anikeeff*, Williams Mullen, PC, Tysons, Virginia, for the defendant-intervenor, with whom was *Shayn Allen Fernandez*, Williams Mullen, PC, Virginia Beach, Virginia, of counsel.

## MEMORANDUM OPINION

***HERTLING*, Judge**

The plaintiff in this pre-award bid protest, AAR Manufacturing, Inc. d/b/a AAR Mobility Systems ("AAR"), challenges Request for Proposals No. FA8534-19-R-0001 (the "Solicitation") for the supply of "Next Generation" ("Next-Gen") air-cargo pallets.  AAR alleges that the

---

* Pursuant to the protective order in this case, the Court initially filed this opinion under seal for the parties to propose redactions of confidential or proprietary information.  The parties informed the Court that no redactions to the opinion are required, and the opinion is accordingly being released in full.

defendant, the United States, acting through the Department of the Air Force ("Air Force"), should exclude defendant-intervenor Taber Extrusions, LLC ("Taber") from the Solicitation's build-to-print contract because Taber has certain organizational conflicts of interest ("OCIs") prohibited by the Federal Acquisition Regulations ("FAR").  Specifically, AAR alleges that Taber has an immitigable biased-ground-rules OCI and unmitigated impaired-objectivity and unequal-access-to-information OCIs.  AAR alleges Taber's OCIs stem from its participation as a subcontractor in the contract for the design of the Next-Gen pallet.

The Air Force and Taber both argue that the Air Force reasonably determined that at least one exception to the FAR provision barring bidders that meet the FAR's definition of having a biased-ground-rules OCI applies.  The Air Force and Taber also argue that there were no unmitigated unequal-access-to-information or impaired-objectivity OCIs under the relevant provisions of the FAR.

For the reasons that follow, AAR's motion for judgment on the administrative record is denied, and the Air Force's and Taber's respective cross-motions for judgment on the administrative record are granted.

## I.      BACKGROUND

### A.      The "Legacy" Pallet

The Air Force developed the "legacy," or 463L, pallet in the 1960s and has used it for cargo air transport ever since.  (Administrative Record at 647, 2498.[1])  The legacy pallet is made of a balsa-wood core with an aluminum skin.  (*Id*.)  The pallet must conform to specific dimensions to be compatible with "variable loaders and cargo-carrying aircraft[,]" including the C-5, C-17, and C-130 cargo planes.  (AR 647-48.)  AAR has been the sole supplier of the legacy pallet (AR 2498) since it "competed and won all previous depot level repair contracts since the first contract award in 1979." (AR at 647.)

### B.      The "Next-Gen" Pallet Development Contract and Subcontract

In 2012, the Air Force initiated an effort to redesign the legacy pallet to enhance its longevity and reduce maintenance costs.  The Air Force contracted with the University of Dayton Research Institute ("UDRI") to perform a feasibility study for a new air-cargo pallet. The study included a review of "alternative suppliers, alternative materials, and alternative designs" to the legacy pallet.  (AR 2651.)  The UDRI study considered multiple alternative designs, core materials, and adhesives before deciding upon an all-aluminum, extruded-core design, "similar to airfield runway matting."  (AR 2651-52, 2655.)  UDRI submitted a final report to the Air Force and received funding for a "'Deep-Dive' [on] structural design optimization."  (AR 2651.)

---

[1] Citations to the Administrative Record submitted by the Agency (ECF 22) are abbreviated "AR."

In 2014, the Air Force awarded UDRI a Rapid Innovation Fund ("RIF") contract for the development, design, and qualification testing of all-aluminum Next-Gen pallets. (AR 2651.) Under its RIF contract, UDRI was required to "prototype, qualify, document, and prepare [a] design for [the] transition [of the Next-Gen pallet] to procurement and production." (AR 2651.) UDRI was also required to develop and deliver a Technical Data Package ("TDP") with drawings, 3-D models, and bill-of-materials spreadsheets to the Air Force, with unlimited data rights. (AR 2804-24.) UDRI engaged three subcontractors, including Taber for aluminum extrusion work, under the RIF contract. (*See* AR 2805-08 (describing subcontractor relationships with Taber and Manufacturing Technology Incorporated ("MTI")).) Under its subcontract with UDRI, Taber provided "goods and embedded services," provided UDRI feedback on metallurgy, and participated in the development of the TDP. (AR 2397-99.)

UDRI completed performance of the RIF development contract in 2016 and delivered Next-Gen pallet prototypes and related data items (*e.g.*, TDP, final report, qualification-test report) to the Air Force. (AR 2647; AR 2663.) In June 2017, following UDRI's completion of the RIF contract, the Air Force exercised an option in that contract to engage UDRI for a manufacturing-maturation contract of UDRI's Next-Gen pallet design. (AR 2456.) The contract also included a limited production run of 500 pallets for testing. (*Id.*) UDRI subcontracted with Taber to manufacture the 500 pallets. (AR 2447.)

During the terms of the RIF and manufacturing-maturation contracts, Taber representatives participated in meetings with the Air Force. (*See, e.g.*, AR 2446-47 (Taber employee describing meeting with the Air Force on April 28, 2015); AR 2453 (Taber employee describing meeting with the Air Force during performance of the manufacturing-maturation contract).)

## C.     This Solicitation

The Air Force posted a sources-sought notice for the solicitation to supply Next-Gen pallets in November 2017. (AR 303.) In March 2018, the Air Force undertook a market-research report based on the four-panel, wide-width UDRI and Taber design. (AR 680.) That market research revealed that several aluminum extruders, that were also potential offerors, would not be able to produce the wide-width panel design that UDRI and Taber had developed. (AR 692 ("All efforts are being taken by the team to improve competition and make updates to the drawing package and specification, without impacting schedule demand.").) In response to the market feedback, the Air Force internally developed a six-panel, narrow-width pallet specification in the fall of 2018. (AR 2420.) That design was finalized in February 2019. (AR 2421.)

In January 2019, the Air Force posted a pre-solicitation notice. (AR 2420.) In February 2019, the Air Force posted the Solicitation's TDP, which contained the four-panel, wide-width design. (AR 928-34.) In March 2019, the Air Force conducted a pre-solicitation conference related to the Solicitation. (AR 98-1017.) During this conference, several potential offerors expressed concern with the four-panel, wide-width design and requested a narrower-width design. (AR 1000, 1001, 1003, 1007, 1010, 1017.) The Air Force ultimately revised the drawings to a six-panel design. (*See, e.g.,* AR 1003; AR 2421.)

In August 2019, the Air Force issued the Solicitation for an indefinite delivery requirements-type contract on a per-unit Fixed-Price with Economic Price Adjustment basis. (AR 1067.)  The Solicitation specifically seeks a contractor to manufacture and produce the Next-Gen pallets during an 18-month base period, eight 12-month options, and one 6-month option, for a total performance period of 10 years.  (*Id.*)

The Solicitation includes a TDP that identifies in detail how the Air Force requires the Next-Gen pallets to be built, the pallets' load characteristics and center of gravity for various lifting and carrying positions, and the pallets' testing requirements.  (AR 1413-36.)   The Solicitation's TDP also includes nine pages of drawings, detailing the exact specifications for the Next–Gen cargo pallets to be produced.  (AR 1391-99.)

### D.    The Air Force OCI Investigation

On December 11, 2019, before the Solicitation's deadline for proposal submissions, AAR protested the terms of the Solicitation at the Government Accountability Office ("GAO"), alleging, among other things, that Taber had multiple OCIs.  Following the filing of AAR's GAO protest, the Air Force conducted a "formal OCI investigation" in December 2019 and January 2020.  (AR 2397.)  The Air Force contracting officer "reviewed the contracting officer's contract file and . . . interviewed or reviewed the affidavits or declarations of fourteen people who had a role in the procurement[,]" including knowledgeable officials from UDRI, Taber, and the Air Force.  (*Id.*)

### 1.    Biased-Ground-Rules OCI

The contracting officer determined that a biased-ground-rules OCI existed because "Taber's role was more significant than mere production."[2]  (AR 2400.)  He determined that Taber initially advocated for a four-panel, wide-width pallet, which the Air Force learned during pre-solicitation industry days would have "drastically limited the number of manufacturers" that could produce aluminum panels wide enough to fit the required dimensions.  (AR 2399.)  The Air Force mitigated that potential OCI by requiring a six-panel design, which called for narrower aluminum extrusions than more aluminum extruders could produce, thereby increasing competition.  (*Id.*)  The contracting officer also determined that Taber had created "new dies of a baseline design" to solve UDRI's problems with the aluminum-extrusion process.  (AR 2400.)  Ultimately, however, the contracting officer determined that the FAR's "design and development

---

[2] The FAR defines a biased-ground-rules OCI as one that arises when a contractor "prepares, or assists in preparing, a work statement to be used in competitively acquiring a system or services—or provides material leading directly, predictably, and without delay to such a work statement unless . . . [i]t has participated in the development and design work; or [m]ore than one contractor has been involved in preparing the work statement." FAR 9.505-2(b)(1).  In such a case, the FAR presumes that the contractor is "in a position to favor its own products or capabilities" and prohibits it from participating in the competition.  FAR 9.505-2(b)(2).

contract" exception to the biased-ground-rules OCI's mandatory exclusion, FAR 9.505-2(b)(1)(ii), applied because the "UDRI RIF contract is a development contract."  (AR 2401.)

The contracting officer also determined that the "multiple contractors" exception applied because "four contractors were on contract to perform the TDP:" UDRI, Taber, MTI, and HF Webster/Wolverine.  (AR 2401-02.)  The contracting officer also found that "UDRI also had substantial involvement with Modern Forge, the manufacturer of the Tie Down Ring, and Hines Precision, Modern Forge's subcontractor, which had to be redesigned the Tie Down Ring to better meet Air Force requirements."  (AR 2402.)  As a result of there being multiple contractors, the contracting officer determined that no single contractor had developed the entire TDP.  (AR 2401-02.)  The contracting officer considered an affidavit from a UDRI representative, who averred that he had been "in contact with" other aluminum extruders about the TDP.  (AR 2402.)  In addition, because the Air Force changed the pallet design after receiving industry feedback at the pre-solicitation conference, the contracting officer concluded that "the representatives of the potential offerors on the Next-Gen Cargo Pallet follow on production contract also materially contributed to the TDP."  Based on this finding, the contracting officer determined that the FAR's "multiple contractor" exception, FAR 9.505-2(b)(1)(iii), applied to Taber and foreclosed a disqualifying OCI.  (AR 2402.)

### 2.      Impaired-Objectivity OCI

The contracting officer also found that allegations of an impaired-objectivity OCI were speculative and unsupported by the facts of the case.[3]  His findings reiterated that Taber's role in the design was "material" but "still extremely limited."  (AR 2403.)  He also expressed confidence that "if Taber found a flaw in the TDP they would remind the Air Force that UDRI was the primary author of the specifications, and submit a request for equitable adjustment[,]" or in the event Taber found room for improvement, a proposed engineering change.  (*Id.*)

### 3.      Unequal-Access-to-Information OCI

Finally, the contracting officer determined that no unequal-access-to-information OCI existed.[4]  He "knew that [he] had not divulged any source selection information, contractor bid or proposal information, or any other competitively useful nonpublic information to Taber[,]" and was "confident" that no other Air Force personnel had done so.  (AR 2404.)  To that end, the contracting officer "received 11 affidavits" from Air Force acquisition-team members asserting

---

[3] According to the FAR, an impaired-objectivity OCI may arise when a "contractor [] will evaluate its own offers for products or services, or those of a competitor[.]"  FAR 9.505-3.

[4] An unequal-access-to-information OCI may arise when a contractor obtains "proprietary and source selection information" that could furnish a competitive advantage, unless mitigating steps are taken through the imposition of appropriate restrictions.  FAR 9.505-4(a)-(c).

that none had not disclosed nonpublic information to Taber.[5]  (*Id.*)  The contracting officer received similar affidavits from UDRI's primary point of contact on the RIF contract and from two Taber employees.  (AR 2405.)  The contracting officer described one instance when a Taber employee discussed "future contracting opportunities" with an Air Force acquisition-team member during a meeting with URDI and Taber concerning the URDI RIF contract.  (AR 2404-05.)  The Air Force team member "explained to Taber that the government couldn't share any information with any vendor to give them a competitive advantage in the next contracting effort[.]"  (AR 2405.)

### E.   The GAO Protest

Before the GAO, AAR alleged that the Air Force had failed to evaluate Taber's biased-ground-rules, impaired-objectivity, and unequal-access-to-information OCIs, and in so doing, failed either to exclude Taber from the procurement or to mitigate Taber's OCIs.  AAR also alleged that the Solicitation's past performance evaluation was unduly restrictive.

The GAO denied both of AAR's protest grounds.  Specifically, the GAO found that AAR failed to show that the contracting officer improperly evaluated Taber's potential OCIs.  The GAO determined that the contracting officer's OCI evaluation was sufficiently detailed so that he knew about any potential OCI.  *AAR Manufacturing, Inc., d/b/a AAR Mobility Systems*, B-418339, Mar. 17, 2020, 2020 CPD ¶ 106.

### F.   The Current Protest

Following the GAO's denial of AAR's protest, AAR filed its complaint with this Court (ECF 1), and Taber moved to intervene (ECF 15).  The parties filed and briefed cross-motions for judgment on the administrative record, and the Court heard oral argument on July 20, 2020.

## II.   JURISDICTION AND STANDING

This Court has jurisdiction over bid protests pursuant to 28 U.S.C. § 1491(b).  *See, e.g.*, *Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005).

To have standing to protest, a plaintiff must demonstrate that it is an "interested party" who suffered prejudice from a significant procurement error, and but for that error, "it would have had a substantial chance of securing the contract."  *See CliniComp Int'l, Inc. v. United States*, 904 F.3d 1353, 1358 (Fed. Cir. 2018).  In a pre-award bid protest such as this one, an interested party is "'(1) an actual or prospective bidder, . . . (2) that [ ] has a direct economic interest.'"  *CGI Fed. Inc. v. United States*, 779 F.3d 1346, 1348 (Fed. Cir. 2015) (quoting *Digitalis Educ. Solutions, Inc. v. United States*, 664 F.3d 1380, 1384 (Fed. Cir. 2012)).  AAR is a prospective bidder, and if the Agency is improperly allowing Taber to compete in the Next-Gen pallet production contract despite Taber's alleged OCIs, as AAR alleges, the competition would

---

[5] The contracting officer actually received ___ affidavits from Air Force personnel, ___ affidavits from UDRI personnel, and ___ affidavits from Taber personnel.  (*See* AR ___.)

be skewed in Taber's favor.  AAR's standing is not contested.  Therefore, AAR is an interested party with standing to maintain this action.

## III.    STANDARD OF REVIEW

In a Motion for Judgment on the Administrative Record pursuant to Rule 52.1 of the Rules of the Court of Federal Claims ("RCFC"), "'the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record.'" *Integral Consulting Servs., Inc. v. United States*, 140 Fed. Cl. 653, 657 (2018) (quoting *A & D Fire Prot., Inc. v. United States*, 72 Fed. Cl. 126, 131 (2006)).  Under RCFC 52.1, the review is limited to the Administrative Record, and the Court makes findings of fact as if it were conducting a trial on a paper record.  *See Bannum, Inc.*, 404 F.3d at 1354.  The Court must determine whether a party has met its burden of proof based on the evidence contained within the Administrative Record.  *Id*. at 1355.  Unlike a summary judgment proceeding, genuine issues of material fact will not foreclose judgment on the Administrative Record.  *Id*. at 1356.

The Court evaluates bid protests under the Administrative Procedure Act's standard of review of agency action.  28 U.S.C. § 1491(b); *Bannum, Inc.*, 404 F.3d at 1351.  An agency procurement action may be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  28 U.S.C. § 1491(b)(4); 5 U.S.C. § 706(2)(A).  Agencies and their contracting officers are "'entitled to exercise discretion upon a broad range of issues confronting them' in the procurement process."  *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (quoting *Latecoere Int'l, Inc. v. U.S. Dep't of the Navy*, 19 F.3d 1342, 1356 (11th Cir. 1994)).  Accordingly, the Court's review of a procuring agency's decision is "highly deferential."  *Advanced Data Concepts v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000).  The Court must sustain an agency action unless it does not "evince rational reasoning and consideration of relevant factors."  *Id*.

The decisive issues in this case are whether Taber's alleged OCIs were sufficiently significant to provide it with a competitive advantage, and whether the contracting officer exercised proper discretion and followed proper procedures in determining that he was not required to exclude Taber from the competition.  Under the FAR, "the identification of OCIs and the evaluation of mitigation proposals are fact-specific inquiries that require the exercise of considerable discretion."  *Axiom Res. Mgmt. v. United States*, 564 F.3d 1374, 1382 (Fed.Cir.2009) (citing 48 C.F.R. § 9.505).  An agency's action, including its OCI determinations, must be upheld unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Turner Const. Co., Inc. v. United States*, 645 F.3d 1377, 1383 (Fed. Cir. 2011) (quoting *PAI Corp. v. United States*, 614 F.3d 1347, 1351 (Fed. Cir. 2010)).  In the context of a contracting officer's OCI determination, "[t]o demonstrate that such a determination is arbitrary or capricious, a protester must identify 'hard facts'; a mere inference or suspicion of an actual or apparent conflict is not enough."  *PAI Corp.*, 614 F.3d at 1352 (quoting *C.A.C.I., Inc.- Fed. v. United States,* 719 F.2d 1567, 1581 (Fed. Cir. 1983)); *see also Filtration Dev. Co., LLC v. United States,* 60 Fed. Cl. 371, 380 (2004) (holding that the disappointed bidder failed to provide "any factual basis" to establish the existence of an OCI).

## IV.    ANALYSIS

AAR argues that Taber has an immitigable biased-ground-rules OCI and unmitigated unequal-access-to-information and impaired-objectivity OCIs stemming from its participation as a subcontractor in the contract for the design of the Next-Gen pallet.  AAR argues that, in light of these OCIs, FAR 9.505-2 requires the Air Force to exclude Taber from the Solicitation.

In general, an OCI exists when, "because of other activities or relationships with other persons or organizations, a[n organization] is unable or potentially unable to render impartial assistance or advice to the government, or the [organization's] objectivity in performing the contract work is or might be otherwise impaired, or the [organization] has an unfair competitive advantage."  FAR 2.101.

Contracting officers are required to "identify and evaluate potential conflicts of interest as early in the acquisition process as possible; and [a]void, neutralize, or mitigate *significant* potential conflicts before award."  FAR 9.504(a) (emphasis added).  A contracting officer's evaluation of whether an OCI exists is a fact-specific inquiry, which requires the "exercise of common sense, good judgment, and sound discretion" for both the decision on whether a "significant potential conflict[]" exists and, if one does, "the development of an appropriate means for resolving it."  FAR 9.505.

AAR alleges that Taber's involvement in the development of the Next-Gen pallet created three types of OCIs.  The first is a biased-ground-rules OCI; such an OCI cannot be mitigated under the FAR.  If a biased-ground-rules OCI is found to exist, Taber must be excluded from the procurement, unless one of the FAR's exceptions applies.  The second and third are an impaired-objectivity OCI and an unequal-access-to-information OCI; such conflicts can and must be mitigated if Taber is to be awarded the contract.

In this case, the contracting officer conducted a detailed OCI review and inquiry, in the course of which he obtained and considered 14 affidavits from Air Force, UDRI, and Taber personnel; reviewed the scope of UDRI's RIF contract and both Taber's and other subcontractors' involvement; examined the Next-Gen pallet-production contract file; and evaluated his own interactions with Taber and UDRI.  Based on his thorough and carefully documented investigation, the contracting officer's determination that no significant OCI existed was reasonable.

### A.    Biased-Ground-Rules OCI

AAR argues that a biased-ground-rules OCI exists because Taber participated in the development of the TDP for the Next-Gen pallet and does not meet the "multiple contractors" exception because it was the only aluminum extruder to develop the TDP.  (ECF 24 at 32-37.)

AAR further argues that the FAR's "development and design" exception is inapplicable because Taber neither created a new product nor acted as a systems engineer.[6]   (ECF 24 at 22-27.)

The Air Force and Taber reject AAR's argument on similar grounds, though Taber makes an argument the Air Force does not.  The Air Force counters that the contracting officer reasonably determined that while Taber materially contributed to the Solicitation's TDP, Taber satisfies two of the FAR's exceptions: first, Taber is covered by the exception for multiple contractors because it was one of four contractors and subcontractors responsible for developing the TDP; and second, Taber meets the exception for "development and design" work, because it "engaged in the iterative process" of prototyping and manufacturing the Next-Gen pallets.  (ECF 29-1 at 2.)  Taber also argues that its work fell under the FAR's exceptions for "development and design" work and multiple contractors but adds to these defenses the argument that it did not materially contribute to the Solicitation because the Air Force rejected Taber's original wide-width, four-panel, wide-width design when it chose to use the narrow-width, six-panel design.

A biased-ground-rules OCI occurs when a company, "by participating in the process of setting procurement ground rules, ha[s] special knowledge of the agency's future requirements that may skew the competition in its favor."  *Turner Const. Co.*, 645 F.3d at 1382.  The FAR presumes that when a contractor "prepares, or assists in preparing, a work statement to be used in competitively acquiring a system or services—or provides material leading directly, predictably, and without delay to such a work statement[,]" FAR 9.505-2(b)(1), that contractor is "in a position to favor its own products or capabilities" and prohibits it from participating in the competition.  FAR 9.505-2(b)(2).  A contractor that has a biased-ground-rules OCI must be excluded from the competition for the system or service for which it helped develop the work statement, unless "[i]t has participated in the development and design work[,] or [m]ore than one contractor has been involved in preparing the work statement."  FAR 9.505-2(b)(1)(ii)-(iii).

Here, the Air Force and AAR accept the contracting officer's determination that Taber contributed to the TDP and, as a result, would be prohibited from competing for the Next-Gen pallet follow-on contract unless an exception to the biased-ground-rules OCI applies.[7]   The contracting officer found that Taber's work as UDRI's subcontractor enabled "Taber materially [to] contribut[e] to the technical data package[,]" for the Next-Gen pallet, and it was "plausible"

---

[6] AAR also argues that the GAO misapplied the "development and design" exception.  AAR's protest is not an appeal from the GAO's denial.  The Court reviews the administrative record independently of the GAO under the Administrative Procedure Act's standard of review.  *Bannum, Inc.*, 404 F.3d at 1351.  This argument is irrelevant.

[7] Taber claims that because the Air Force selected the narrow-width, six-panel pallet design instead of its original wide-width, four-panel design, it "was not involved in developing the drawings, TDP, testing, evaluation or other aspects of the new pallet design[.]"  (ECF 26-1 at 25.)  This argument both is at odds with the contracting officer's reasonable determination that Taber materially contributed to the TDP and does not allege hard facts that the contracting officer ignored.  (AR 2399.)  Taber's argument amounts to mere disagreement with the contracting officer's determination, and the Court rejects it.

that Taber would have "skewed the competition towards itself." (AR 2399.) Indeed, the contracting officer acknowledged that Taber *had* attempted to skew the competition towards its own wide-width extrusion capabilities with the four-panel, wide-width pallet design, but that the Air Force had adopted the six-panel design after receiving industry feedback. (AR 2402.) Because the contracting officer reasonably determined that Taber could have a biased-ground-rules OCI, he had to evaluate whether Taber would have to be excluded from the Next-Gen competition, or whether one of the FAR's exceptions to the ban applied.

### 1. "Multiple Contractors" Exception

The FAR exempts from its ban on contractors who have a biased-ground-rules OCI a contractor that worked with other contractors to prepare a work statement. *See* FAR 9.505-2(b)(1)(iii); *see also Am. Artisan Productions, Inc.*, B-292559, B-292559.2, Oct. 7, 2003, 2003 CPD ¶ 176 (multiple contractors prepared planning and design work for museum exhibits); *Sys. Made Simple, Inc.*, B-412948.2, July 20, 2016, 2016 CPD ¶ 207 (the multiple-contractor exception applied when two contractors conducted independent studies of "the VA NSD function.").[8]

UDRI employed both Taber and MTI as subcontractors for aluminum extrusion and friction-stir welding, respectively, and Taber employed HF Webster/Wolverine as its own second-tier friction-stir welding subcontractor. (AR 2401.) UDRI also employed Modern Forge as a subcontractor to manufacture the tie-down rings. (AR 2402.) Modern Forge employed Hines Precision as its own second-tier tie-down ring manufacturer. (*Id.*) Taber was the sole manufacturer of the "prototype extrusions," which it delivered to MTI to fashion into the prototype pallet. (*See, e.g.*, AR 3367 ("Taber Extrusions is planning to deliver the prototype extrusions in late February 2015. MTI will commence with pallet prototyping upon receipt of those extrusions."); AR 3530 (describing UDRI's subcontracts as "machining of the extrusion dies for Taber; and machining of the finished extrusions for MTI.").) AAR argues that only Taber performed the aluminum-extrusion work and drafting portions of the TDP, and therefore the "multiple contractors" exception is inapplicable.[9] (ECF 24 at 34-35.) Both the Air Force and Taber argue, on the other hand, that the TDP cannot be broken into its constituent parts, so that

---

[8] The GAO's decisions may be cited as persuasive authority but are not precedential or binding on this Court. *See Centerra Grp., LLC v. United States*, 138 Fed. Cl. 407, 414 (2018).

[9] AAR points to the National Aeronautics and Space Administration's OCI guide, which notes that there is a dearth of case law on the applicability of the "multiple contractors" exception and provides that "more than one contractor must be involved in the preparation of the same part of the specification or [Statement of Work ("SOW")] for this method of [OCI] avoidance to work." *National Aeronautics and Space Administration's Guide on Organizational Conflicts of Interest*, NASA (Mar. 2010) at 17, http://www.hq.nasa.gov/office/procurement/regs/guides/OCI_Guide.pdf. The guide also notes that "[h]aving a contractor review another contractor's proposed specification or SOW does not meet the ["multiple contractors" exception] since preparation may have given a contractor much more latitude to influence the requirements document than does approval of a requirements document." *Id.*

Taber's role as the only aluminum-extrusion contractor cannot be viewed in isolation.  (ECF 25 at 12-13; ECF 26-1 at 29-30.)

Close review of the contracting officer's determination supports AAR's argument.  The contracting officer identified MTI and HF Webster/Wolverine, both friction-stir welders, and Modern Forge and Hines Precision, both tie-down ring manufacturers, as having participated in UDRI's contract.  (ECF 2401-02.)  The only other aluminum-extrusion input, however, that the contracting officer identifies UDRI or the Air Force receiving was from "industry representatives," who advocated against Taber's four-panel, wide-width pallet design because it would require wider aluminum extrusions than those that most extruders could produce.  (ECF 2402.)  Industry representatives are not, however, contractors involved in drafting specifications.  If that were the case, then any participant in a pre-solicitation "industry day" or in a solicitation's question-and-answer process whose question resulted in a modification would be elevated to the status of a development contractor and subject to OCI review.

UDRI and its subcontractors Taber, MTI, and Modern Forge, Taber's subcontractor HF Webster/Wolverine, and Modern Forge's subcontractor Hines Precision contributed to the same end-product, but each did different work.  Taber was the only subcontractor with responsibility over extruding the aluminum, which was a discrete and specific element that only Taber could review and influence.  That lack of oversight was made clear when neither the Air Force nor any of the contractors or subcontractors noticed that Taber's four-panel, wide-width pallet extrusions favored its own capabilities until the Air Force began its market research.  (*See* AR 692, AR 1003, AR 2421.)

The Court holds that the "multiple contractor" exception to the biased-ground-rules OCI provision does not apply when a single subcontractor is responsible for a discrete and distinct portion of a contract.  Even if those subcontractors are working on the same end-product, the "multiple contractors" exception cannot apply when one subcontractor alone can review and influence its own work.  The reading of the "multiple contractors" exception urged by the Air Force and Taber is too narrow and would eviscerate the underlying OCI rule, given how many specialty subcontractors must often be engaged on a contract, each performing a task within its own specialty.

The only reasonable finding here is that Taber was the sole subcontractor involved in developing the aluminum-extrusion TDP under the UDRI RIF contract.  The contracting officer could not have reasonably found that there were multiple aluminum extruders developing the specifications for the Next-Gen pallet.  Accordingly, the determination that the "multiple contractors" exception applies to this Solicitation is arbitrary and capricious.  This error, however, is harmless because the Court finds that the "development and design" exception is applicable to this procurement.

### 2.   "Development and Design" Exception

Contractors that participate in "development and design" work are exempted from exclusion from a follow-on competition based on a biased-ground-rules OCI.[10]  *See* FAR 9.505-2(b)(1)(ii).  The FAR justifies that exception because "[i]n development work, it is normal to select firms that have done the most advanced work in the field[,]" because such firms have a larger knowledge base to use for development and design.  FAR 9.505-2(a)(3).  "Thus, while the development contractor has a competitive advantage, *it is an unavoidable one that is not considered unfair*; hence no prohibition should be imposed."  *Id.* (emphasis added).  This Court has recognized that "development and design" work includes designing, engineering, and testing a system.  *See Vantage Assocs., Inc. v. United States*, 59 Fed. Cl. 1, 2-3, 11-12 (2003).

AAR's argument that the Next-Gen pallet is not a new product and thus could not have been "developed" by UDRI and Taber (ECF 24 at 24), ignores the plain terms of UDRI's contracts, and the substance of Taber's work thereunder.  UDRI had three contracts, one to test feasibility (AR 2651), the RIF contract to develop the Next-Gen pallet (AR 2651), and the manufacturing-maturation contract of UDRI's Next-Gen pallet design (AR 2456).  As the contracting officer confirmed, UDRI's work constituted development.  (AR 2401.)  UDRI's RIF contract, for instance, included contract line items for prototyping, Next-Gen pallet test and inspection reports, product drawings and models, and a TDP.  (AR 2476-81.)  As for Taber, the contracting officer acknowledged that Taber had "respond[ed] to UDRI's questions and materials and manufacturing feasibility[,]" especially as to reviewing "drawings and plans to determine if they are feasible in terms of extrudability, tooling, dies, tolerances, or presses, and associated costs." (AR 2398.)  Taber had "noted concerns with UDRI's drawings regarding desired tolerances and wall thickness and addressed UDRI's questions regarding metallurgy choice."  (*Id.*)  This work was integral in developing the Next-Gen pallet design, which was the basis for the build-to-print specification in this Solicitation.  (AR 2401.)  The contracting officer reasonably determined that Taber's work was "development and design" work.  *See Vantage Assocs., Inc.*, 59 Fed. Cl. at 2-3, 11-12.

AAR's disagreement about the scope of design or development work required to transition a balsa-wood-and-aluminum pallet to an all-aluminum pallet does not render irrational

---

[10] Neither FAR Part 9 nor FAR 2.101 defines "design" or "development."  FAR 35.001 defines "development" as

> the systematic use of scientific and technical knowledge in the design, development, testing, or evaluation of a potential new product or service (or of an improvement in an existing product or service) to meet specific performance requirements or objectives.  It includes the functions of design engineering, prototyping, and engineering testing; it excludes subcontracted technical effort that is for the sole purpose of developing an additional source for an existing product.

the contracting officer's determination that such work was, in fact, "development and design" work.  If changing from the legacy pallet to the Next-Gen pallet did not require the development of a new product, the Air Force could have simply modified one of AAR's depot maintenance contracts, directing it to build an all-aluminum pallet.  That was obviously not feasible.  Such a change to an existing contract would be a cardinal change.[11]  The process of the procurement itself—three research-and-development contracts—rebuts AAR's argument and supports the contracting officer's determination that the exception applied.

AAR's perspective on what constitutes "development and design" to turn an existing product into a new, improved model is too narrow.  AAR would not credit Apple with "development and design" work to design an iPhone 4S from an iPhone 4, for example, despite the improvements and greater functionality of the former.  The work required to convert the balsa-and-aluminum legacy pallet into the all-aluminum Next-Gen pallet required testing "alternative suppliers, alternative materials, and alternative designs" to the legacy pallet (AR 2651), developing and testing prototypes (AR 2651), and testing the manufacturing process (AR 2647, AR 2663).  Indeed, FAR 35.001 specifically captures within its definition of "development" the "use of . . . technical knowledge in the design, development, [and] testing . . . of an improvement in an existing product . . . ," precisely what occurred here.  The contracting officer's determination that the new all-aluminum Next-Gen pallet required development and design, even if based on the legacy pallet, is consistent with the FAR's own relevant definition.

AAR further argues that Taber did not perform "development and design" work as a subcontractor to UDRI because Taber's original four-panel pallet design was not adopted, and thus Taber only drafted the TDP.  (ECF 35 at 3-4.)  This argument is undercut by the record before both the contracting officer and the Court.  The record reveals that Taber contributed to the Next-Gen pallet design through its initial four-panel design and by participating in meetings with UDRI and the Air Force.  (*See, e.g.*, AR 2397-2402.)  As the Air Force argues, Taber's four-panel pallet design was part of an iterative design process.  (ECF 29-1 at 2.)  Even though Taber's proposed design was ultimately rejected, the fact of its rejection is itself evidence that Taber contributed to the design process.  (AR 2400.)  Taber's work went beyond merely writing Solicitation documents; Taber's expertise and experience were core elements of the pallet's development and design.  *See Alabama Aircraft Indus., Inc.-Birmingham v. United States*, 83 Fed. Cl. 666, 689, n.48 (2008), *rev'd on other grounds*, 586 F.3d 1372 (Fed. Cir. 2009) (contractor's work in assisting the Air Force to explore alternative designs meets the "development and design" exception).

More to the point, given the applicable standard of review, the Court finds that the contracting officer reasonably determined that the UDRI RIF contract was a development contract for the development of a TDP for the follow-on production of the Next-Gen pallet.  (AR

---

[11] If there had been such a contract modification, Taber or another potential offeror would likely have protested it as a cardinal change that could not be anticipated from the scope of the original contract.  *See AT&T Commc'ns, Inc. v. Wiltel, Inc.*, 1 F.3d 1201, 1205 (Fed. Cir. 1993) (citation omitted) ("A modification generally falls within the scope of the original procurement if potential bidders would have expected it to fall within the contract's changes clause.").

2401.)  He also examined the work that Taber performed as a subcontractor and reasonably determined that it was "development and design" work.  (AR 2400-01.)  The Court will not second-guess the contracting officer's reasonable judgment as to the type of contract at issue and, thus, declines to find a biased-ground-rules OCI on this basis.

AAR also argues that Taber's role as UDRI's subcontractor was that of a systems-engineering and technical-direction contractor, and, as a result, Taber does not qualify for the "development and design" exception.[12]  The FAR prohibits the award of a system-supply contract to a "contractor that provides systems engineering and technical direction for a system" because such activities are "highly influential" and can make a contractor responsible for "determining a system's basic concepts."  FAR 9.505-1(a), (b).  The prohibition only applies, however, to contractors that "do[] not have overall contractual responsibility for [the system's] development, its integration, assembly, and checkout, *or its production*."  FAR 9.505-1(a) (emphasis added).  The plain language of FAR 9.505-1(a) does not apply to Taber's role as UDRI's subcontractor.  UDRI's contracts were not systems-engineering and technical-direction contracts, and Taber's work as a subcontractor thereunder was not systems-engineering or technical-direction work.  Even if UDRI's contracts and Taber's subcontracts thereunder were systems engineering or technical direction, the FAR's prohibition would not apply because Taber had overall contractual responsibility for manufacturing—the "production" of—the prototypes of the Next-Gen pallet.  Contractors, like Taber, that manufacture the system being acquired are not covered by this FAR provision, and AAR's argument to the contrary fails.

The contracting officer did not err in not considering the applicability of the systems-engineering and technical-direction provision to this procurement in his investigation of and rejection of Taber's alleged OCIs.

The Court finds that the contracting officer's determination that the "development and design" exception applies to Taber because of the nature of the work Taber provided to UDRI as a subcontractor on UDRI's RIF contract is reasonable.

## B.     Impaired-Objectivity OCI

AAR alleges that Taber has an impaired-objectivity OCI because it will be in a position to evaluate its own TDP in the event it is awarded the contract.  AAR specifically argues that Taber would be disincentivized to submit proposals to improve the pallet or to perform the contractor's quality-control functions.  (ECF 24 at 38.)  The Air Force and Taber argue that no

---

[12] The FAR explains that "systems engineering" may include "determining specifications, identifying and resolving interface problems, developing test requirements, evaluating test data, and supervising design," while "technical direction" includes "developing work statements" and "determining parameters."  FAR 9.505-1(b).  Production or manufacturing is not included within the definition.

such conflict exists because AAR is only able to speculate about possible future conflicts but not allege any "hard facts." (ECF 25 at 14-15; ECF 26-1 at 36-37.)

An impaired-objectivity OCI can occur when a contractor's "work under one government contract could entail its evaluating itself, either through an assessment of performance under another contract or an evaluation of proposals." *Alabama Aircraft Indus., Inc.*, 83 Fed. Cl. at 687-88 (quoting *Aetna Gov't Health Plans, Inc.; Foundation Health Fed. Servs., Inc.*, B-254397 *et al.*, July 27, 1995, 95-2 CPD ¶ 129); *see also* FAR 9.505-3.

The record does not substantiate the allegations that Taber, *if* awarded the contract, would not perform the quality control required or submit proposals to improve the Next-Gen pallet. Protesters must support their OCI allegations with "hard facts;" speculation is not sufficient. *PAI Corp.*, 614 F.3d at 1352 (citations omitted). The contract has not been awarded (and Taber's proposal is not even part of the Administrative Record), and AAR has not provided the Court with record evidence or hard facts providing reasons to doubt the affidavits from the Air Force, UDRI, and Taber personnel on which the contracting officer relied to find that no impaired-objectivity OCI exists. Under these conditions, "[r]esolution in favor of the plaintiff on this issue would require the court to infer too many hard facts." *RhinoCorps Ltd. Co., v. United States*, 87 Fed. Cl. 261, 277 (2009); *see also Sigmatech, Inc. v. United States*, 141 Fed. Cl. 284, 338 (2018) (refusing to infer impaired-objectivity OCI based on protester's allegations, when those allegations contradicted the record and declarations from the contracting officer's representative).

The Court rejects AAR's allegation of an impaired-objectivity OCI.

### C.    Unequal-Access-to-Information OCI

AAR argues that the contracting officer did not properly evaluate the information to which Taber had access because he failed to determine what information was shared with Taber and ignored Taber's access to allegedly competitively-useful information beyond what an incumbent contractor may be expected to have. (ECF 24 at 42-47.) The Air Force and Taber respond by detailing the affidavits the contracting officer received certifying that Taber did not have access to non-public, competitively-useful information. (ECF 25 at 15-17; ECF 26 at 31-32.) Taber further argues that any non-public information to which it had access concerned only the rejected design for the four-panel, wide-width pallet design, and this access constituted a permissible incumbent advantage (ECF 26 at 33-34).

An unequal-access-to-information OCI occurs when "a company has access to nonpublic information in performing a government contract that may give it a competitive advantage in a later competition for a government contract." *Turner Constr. Co.*, 645 F.3d at 1382; *see also* FAR 9.505-4(a) ("When a contractor requires proprietary information from others to perform a Government contract and can use the leverage of the contract to obtain it, the contractor may gain an unfair competitive advantage unless restrictions are imposed."). For an unequal-access-to-information OCI to exist, a contractor must have "access to 'the kind of specific, sensitive information that would create an OCI[,]'" meaning information "'to which no other offeror had access.'" *Ala. Aircraft Indus., Inc.*, 83 Fed. Cl. at 688 (quoting *Sys. Plus, Inc. v. United States*, 69 Fed. Cl. 757, 772 (2006)). Furthermore, this type of OCI can be mitigated. FAR 9.506(d)(3).

15

AAR's attempt to show that the contracting officer did not know to what information Taber had access cannot succeed.  AAR simply alleges that Taber *could* have had access to information, including testing information, about the current Solicitation from its work on UDRI's limited-run production contract in 2017.  (ECF 24 at 45-47.)  AAR does not, however, allege any "hard facts" to support its speculation that the contracting officer failed to discover the extent of the nonpublic information to which Taber had access.  (*See id.* at 43-46.)

AAR's argument is contradicted by the record.  The contracting officer reviewed the contract file, interviewed Air Force, UDRI, and Taber employees, and reviewed the scope of UDRI's RIF contract and both Taber's and the other subcontractors' involvement with that contract.  He did more than merely rubber-stamp rote affidavits, as the plaintiff suggests.  The extent of Taber's knowledge has been thoroughly investigated and, as a result, is known.  The only information to which Taber has access and other parties do not is the final report with testing data from its abandoned wide-width, four-panel design.  (*See* AR 1005.)  That information is irrelevant to this Solicitation.  As to testing data covering the Solicitation's six-panel design, the record before the contracting officer is replete with sworn statements from Air Force personnel involved with the testing to the effect that Taber had no access to those testing data.  (ADD CITE.)  The contracting officer reasonably determined, based on the record before him in his investigation, that, at this phase of the competition, Taber's knowledge does not constitute an unequal-access-to-information OCI.  The Court will not disturb the contracting officer's reasonable judgment based on anything less than "hard facts."  *See RhinoCorps Ltd. Co*, 87 Fed. Cl. at 277.  The plaintiff's speculation is insufficient.

The contracting officer reasonably determined that no unequal-access-to-information OCI exists.

## V.   CONCLUSION

Because the contracting officer reasonably determined that an exception to the biased-ground-rules OCI applies, and that there are no unequal-access-to-information or impaired-objectivity OCIs, the Court denies the plaintiff's motion for judgment on the administrative record and grants the cross-motions of the defendant and defendant-intervenor.

The Court will issue an order in accordance with this decision.

s/ Richard A. Hertling
**Richard A. Hertling**
**Judge**

16